UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RICHARD PROVENCHER, | : | Civil Action |
| RICHARD HALL, WILLIAM GARBATI, | : | |
| WILLIAM HAYDEN, GEORGE | : | No. 3:00 CV 2358 (CFD) |
| GAUTHIER, WARREN RUDDLESDEN, | : | |
| WILLIAM ZERONSA, and MICHAEL | : | |
| WHEELER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PFIZER INC, | : | |
| | : | |
| Defendant. | : | November 30, 2004 |

**DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT**

In support of its Motion for Summary Judgment, and in accordance with D. Conn.

L. Civ. R. 56(a)1, defendant Pfizer Inc ("Pfizer") submits the following statement of

material facts as to which there is no genuine issue to be tried:

**A.     Reorganization and Restructuring of Pfizer's Groton Plant**

1.     Pfizer is one of the world's leading pharmaceutical companies,

headquartered in New York City.  Since the late 1940s, Pfizer has operated a

manufacturing facility in Groton, Connecticut (the "Groton Plant"), where it has

produced a variety of pharmaceutical and chemical products.  Hertenstein Decl. (Ex. 8) at ¶ 4.[1]

2.     Between 1990 and 2000, the Groton Plant was part of different organizations.  Groton Plant management reported to appropriate Division management, who in turn reported to Corporate management.  Hertenstein Decl. (Ex. 8) at ¶ 5.

3.     By the late 1980s, production costs at the Groton Plant were high in comparison to newer Pfizer facilities and to the company's competitors.  Corporate management directed Groton Plant management to become more efficient, more productive, and more competitive.   Hertenstein Decl. (Ex. 8) at ¶ 6.

4.     During the 1990s, Groton Plant management communicated to employees, clearly and repeatedly, that the working environment at the Plant would change significantly in many ways, and that the size of the Plant's workforce would be substantially reduced.  Hertenstein Decl. (Ex. 8) at ¶ 7.

5.     In the mid-1990s, Pfizer decided to focus its business efforts on research-based health care products, and began to discontinue and sell its more commodity-based product lines.  The Groton Plant was significantly affected, with numerous production facilities closed as a result.  Hertenstein Decl. (Ex. 8) at ¶ 8.

---

[1]  References to Declarations are designated "Decl. at ¶ __"  and by exhibit number as contained in the Appendix of Exhibits accompanying this Statement. References to depositions include the name of the deponent, the transcript's exhibit number as contained in the Appendix, and the page number of the relevant testimony. References to additional documents are identified by description and exhibit number as contained in the accompanying Appendix.  Unless otherwise noted, citations to the "Complaint" refer to plaintiff's Second Amended Complaint dated September 27, 2004.

6.    Pfizer committed substantial resources to upgrade the Groton Plant's infrastructure and technology while decommissioning and demolishing the idled manufacturing facilities.  To fill the gap that would be created by this lost production, Plant management began aggressively to seek new products to manufacture at Groton. Hertenstein Decl. (Ex. 8) at ¶ 8.

**B.    Voluntary Separation Packages at the Groton Plant**

**1.    VSP Establishment**

7.    The restructuring of the Groton Plant also was influenced significantly by the sale of Pfizer's Food Sciences Group to a Finnish company (Cultor) in January of 1996.  As part of that sale, Pfizer entered into an agreement to continue manufacturing certain product lines for four to six years.  While the Groton Plant may have preferred to shut down all of these products lines at one time, the terms of its agreement with Cultor precluded this.  Hertenstein Decl. (Ex. 8) at ¶¶ 16-20.

8.    Plant management also forecasted that fewer workers would be needed as the Groton Plant's technology and product mix changed.  The means available to reduce the size of the Groton workforce during the 1990s included attrition, voluntary and involuntary transfers (either within the Plant or to other facilities or divisions of Pfizer located at Groton or elsewhere), involuntary layoffs, and incentive programs. There were also significant opportunities to transfer manufacturing employees to Pfizer's Central Research Division, which maintained a facility in Groton, and which was expanding. Hertenstein Decl. (Ex. 8) at ¶ 9.

3

9.      In the early 1990s, Groton Plant management did not plan to offer severance incentives, referred to as "voluntary separation programs" or "VSPs", at any specific time.  Plant management engaged in annual efforts to forecast its "staffing" needs as part of the normal budget process.  Forecasts were based on assumptions about when production lines would be shut down and how much manpower would be occupied by new products.  Unexpected changes in production loading affected the accuracy of those forecasts.  Hertenstein Decl. (Ex. 8) at ¶ 10.

10.      Groton Plant management only considered a VSP as an option in response to changing business conditions and corresponding staffing requirements. Typically, when management learned that production in a particular department would be curtailed or eliminated, it first analyzed the number of employees in the affected departments and determined whether the Plant could absorb some or all of those employees by transfer.  If transfers were not possible, management considered some type of VSP. Hertenstein Decl. (Ex. 8) at ¶ 11.

11.      During the mid- to late-1990s, the prospect of offering a VSP first arose in the course of the Groton Plant's annual budget review process, which occurred during the months of August and September for the following calendar year budget. Evaluation of production requirements and staffing needs was undertaken contemporaneously.  In response to anticipated (or, more often, unanticipated) decreases in expected production needs, Plant management evaluated each

4

department's staffing needs for the coming fiscal year.  This analysis was done in consultation with department heads. Hertenstein Decl. (Ex. 8) at ¶12.

12.     Groton Plant management initially addressed the potential for a VSP (which ultimately became the 2000 VSP announced on October 29, 1999) in or about August of 1999.  Division management and Corporate management did not consider Plant management's request for that VSP until late October, 1999.  Hertenstein Decl. (Ex. 8) at ¶ 13 and Ex. A.

13.     In considering a potential VSP, Plant management first attempted to gauge the level of interest among colleagues in the affected departments in an effort to forecast the success of a VSP in inducing employees to opt for early retirement.   At times, employees who management did not believe would opt for early retirement in fact decided to accept the benefit, while others whom management expected to take the benefit declined to do so.  In the former instance, management was often forced to fill the unexpected openings via hiring or via temporary hires.  Management sometimes asked retired colleagues who had received a VSP to return to the Plant as temporary contract workers to provide services to the company post-retirement.  Similarly, management also from time to time needed to request that retired colleagues who had not received a VSP return to provide services as temporary contract workers. Hertenstein Decl. (Ex. 8) at ¶¶ 14-15.

14.     When Pfizer offered VSPs between 1995 and 2000, it did so in reaction to changing business conditions.  Management at the Groton Plant (including the Plant Manager) did not have authority to adopt a VSP.  If management concluded that a VSP would be useful to address excess staffing, it was required to submit a proposal to Division and Corporate management at Pfizer's corporate headquarters in New York City.  The Groton Plant could proceed with a VSP only after receiving Corporate approval. Hertenstein Decl. (Ex. 8) at ¶ 16; Hightower Decl. (Ex. 9) at ¶ 35.

15.     While Plant management in Groton was aware of the company's desire to use VSPs rather than layoffs as a means to reduce the size of the Plant workforce, it were required to seek and obtain corporate management approval before offering each and every VSP.  Such approval was not automatic: in 1994, Groton Plant management sought authority to offer a limited VSP in response to the projected curtailment of CTC operations and organizational consolidation between the CTC and Itaconic teams. Corporate management, however, refused that request and the Plant did not offer a VSP in that year.  Hertenstein Decl. (Ex. 8) at ¶ 23; Hightower Decl. (Ex. 9) at ¶ 36.

2.     **VSPs Offered Between 1995 and 2000**

16.     Each of the VSPs was a separate benefit plan developed to meet and address a specific change in circumstances at the Groton Plant.  The 1995 VSP was offered to every employee in the Plant because, as of September of 1995 (when that VSP was announced), Plant management knew that production in three significant areas (Organic I, Sorbitol, and Caffeine) would cease entirely by December 31, 1995.

6

Later VSPs, however, were targeted at certain departments (and at times certain job classifications within departments) in response to unexpected or premature termination of specific production areas. Hertenstein Decl. (Ex. 8) at ¶¶ 16-22.

17.     Pfizer announced the 1995 VSP on September 13, 1995.  Hightower Decl. (Ex. 9) at ¶¶ 6-7 and Exs. A, B.

18.     The 1995 VSP was offered to all departments and all employees in the Groton Plant because production operations in three primary production areas in the plant (Organic I, Sorbitol, and Caffeine) were projected to cease by year-end 1995. Hightower Decl. (Ex. 9) at ¶ 8.

19.     Pfizer announced the 1998 VSP on November 12, 1997.  Hightower Decl. (Ex. 9) at ¶¶ 9-10 and Exs. C, D.

20.     The 1998 VSP was offered to certain classes of employees in certain departments because production operations in NMG (N-Methylglucamine, a product used in detergent manufacturing) and Veltol (a food additive) were projected to cease by year-end 1998, and Pfizer was in the process of refurbishing and automating a primary manufacturing facility (Building 123).  Eligibility was limited to certain employees in affected departments because actual staffing exceeded the net 1998 year-end staffing requirements.  Hightower Decl. (Ex. 9) at ¶¶ 11-12.

21.     Pfizer announced the 1999 VSP on October 15, 1998.  Hightower Decl. (Ex. 9) at ¶¶ 13-14 and Exs. E, F.

7

22.    The 1999 VSP was offered to certain classes of employees in certain departments due to (i) continued curtailment of Cultor manufacturing operations; (ii) the projected termination of NMG production by year-end 1998; and (iii) the projected termination of Itaconic production in March, 1999.  Eligibility was limited to certain employees in affected departments because of projected excess staffing for 1999.  Hightower Decl. (Ex. 9) at ¶¶ 15-16.

23.    Pfizer announced the 2000 VSP on October 29, 1999.  Hightower Decl. (Ex. 9) at ¶¶ 17-18 and Exs. G, H.

24.    The 2000 VSP was limited to certain classes of employees in certain departments because of continued curtailment of Danisco/Cultor production (formerly Pfizer's Food Sciences Group).   Eligibility was limited to certain employees in affected departments because specific skills lost through the VSP would require Pfizer to hire replacements.  Hightower Decl. (Ex. 9) at ¶¶ 19-20.

25.    The formal plan document establishing each VSP at issue in this case contains the following statement:

> This document and its attendant documents are not intended to create any contractual rights with employees.  The Company reserves the right to amend or terminate the Program with or without participant notice.  The Company has the exclusive right to determine eligibility for benefits and to interpret the provisions of the Plan.

Hightower Decl. (Ex. 9) at Exs. B, D, F, H.

26.    Each of the plaintiffs (except William Zeronsa) was eligible to participate in the 1995 VSP.  Hightower Decl. (Ex. 9) at ¶¶ 22-25 and Exs. I, J, K, L.

8

27.     None of the plaintiffs in this case was eligible to participate in the 1998, 1999, or 2000 VSPs because those VSPs were limited to certain departments to which the plaintiffs were not assigned and/or to certain and job classifications which the plaintiffs did not hold.  Hightower Decl. (Ex. 9) at ¶¶ 27-31.

28.     Neither Plant management nor the human resources department at the Groton Plant at any time has used the word "surplus" with reference either to employees' status with the company or to VSP eligibility.  The word also has not been used in the establishment or administration of any VSP.  Hightower Decl. (Ex. 9) at ¶ 37.

**C.     Alleged "Favoritism" in VSP Administration**

29.     Pfizer's decision-making with respect to determining which departments and classes of employees would be eligible for participation in VSPs was done without reference to any particular employee's situation.  Pfizer never offered a VSP to a particular employee for the purpose of showing "favoritism" to that employee.  The decision-making at all times was based on Pfizer's manufacturing production requirements and corresponding staffing needs. Hightower Decl. (Ex. 9) at ¶ 34.

30.     The plaintiffs have identified a number of former Pfizer employees who they claim received VSPs as a result of "favoritism" showed by Pfizer.  However, the plaintiffs have no personal knowledge of the circumstances under which any of those individuals received a VSP.  Provencher dep. (Ex. 1) at 46-51; Hall dep. (Ex. 2) at 11-17, 92-110, 117-19; Garbati dep. (Ex. 3) at 57-62, 86-89; Hayden dep. (Ex. 4) at 149-53; Gauthier dep. (Ex. 5) at 87-89, 107-09, 123-29, 132-33; Zeronsa dep. (Ex. 7) at 39-

42, 95-98.  One plaintiff has no knowledge of any such "favoritism."  Ruddlesden dep. (Ex. 6) at 115.

31.     Plaintiffs' contention that other Groton Plant employees received special consideration with respect to VSP benefits is incorrect.  Each of the employees to whom plaintiffs have referred either did not receive a VSP from Pfizer's Groton Plant, or was eligible to participate in a VSP offered by Pfizer pursuant to the terms of the Plan documents because they were in a department and/or held a position included in the VSP for the year in which they elected to participate in the program.  Hightower Decl. (Ex. 9) at ¶ 33.

**D.     Transfers to Quality Control**

32.     Prior to July of 1996, laboratory technicians in the Groton Plant worked either in an In-Process Control (IPC) Lab or in the Quality Control department.  In or about July of 1996, the IPC Labs were consolidated into the Quality Control department at the Groton Plant.  Prior to that time, the IPC Labs were part of the manufacturing operation; Quality Control was not part of any manufacturing business unit, but instead reported directly into a separate Quality Control Division in Pfizer's corporate headquarters in New York.  Hertenstein Dec. (Ex. 8) at ¶ 25.

33.     In or about January of 1998, Pfizer restructured its laboratory testing organization on a company-wide basis.  As a result of the reorganization, Quality Control ceased to exist as a separate Division, and Quality Control personnel began reporting directly to plant managers.  Thus, Quality Control personnel at the Groton

Plant began reporting to the Plant Manager.  This change occurred for all Pfizer plants globally. Hertenstein Dec. (Ex. 8) at ¶ 26.

34.    The integration of the IPC Labs into the Quality Control Division was made at the request of Headquarters Divisional leaders in both the Manufacturing and Quality Control Divisions in an effort to upgrade the professionalism of the IPC labs (it was thought that central control of all plant labs would bring operational efficiencies and excellence). Groton Plant management had only an indirect role in the decision to restructure the Quality Control area between 1996 and 1998.  No employees in the IPC Labs were transferred to Quality Control for any reason other than to comply with the corporate restructuring of this aspect of the Groton Plant's business.  Any such transfers -- including the transfers of plaintiffs Hall, Garbati, and Provencher -- were done solely for business reasons, and had no relationship whatsoever to any existing or future VSP. Hertenstein Dec. (Ex. 8) at ¶ 27; Hightower Decl. (Ex. 9) at ¶ 26.

**E.    Responses to Plaintiff Complaints**

35.    Kerry Hertenstein (Groton Plant Site Leader), Brooks Walker (Groton human resources director), and Richard Illingworth (director of human resources for Pfizer's global manufacturing operations) were involved in responding to complaints made by four of the plaintiffs (Hayden, Gauthier, Zeronsa, and Ruddlesden) regarding their inability to participate in VSPs announced in 1997 and 1999.  Hertenstein Decl. (Ex. 8) at ¶ 29 and Exs. B, C; Illingworth Decl. (Ex. 10) at ¶¶ 4-11 and Ex. A; Walker Decl. (Ex. 11) at ¶¶ 4-13 and Exs. A-G.

36.     At Hertenstein's request, on December 17, 1999, Walker sent memoranda
to Gauthier, Zeronsa, and Ruddlesden explaining the reasoning behind the exclusion of
their departments form the 2000 VSP.  Hertenstein Decl. (Ex. 8) at ¶¶ 30-31 and Exs.
D-G; Walker Decl. (Ex. 11) at ¶¶ 11-12 and Exs. D-G.

37.     Hertenstein, Walker, and Illingworth also met personally with Gauthier,
Zeronsa, and Ruddlesden to discuss their concerns.  During these meetings, these
plaintiffs made clear that they disagreed with Pfizer's conclusions regarding which
departments and job classifications should be eligible for the VSP.  Pfizer
representatives advised these plaintiffs that Pfizer had made its decisions based on the
company's business needs; that the decision was final; and that Pfizer could make no
special exceptions for any employee.  Hertenstein Decl. (Ex. 8) at ¶¶ 32-33; Illingworth
Decl. (Ex. 10) at ¶ 9; Walker Decl. (Ex. 11) at ¶ 13.

38.     At the time Gauthier, Zeronsa, and Ruddlesden were requesting that they
be included in the 2000 VSP, Pfizer personnel knew (or at least heard via rumor) that
one or more of them were threatening to file suit against Pfizer.  Nevertheless, Pfizer did
not feel that it could relent to their demands because by doing so the Plant not only
would be losing valued colleagues, but also favoring them over other employees who
also might have desired a VSP option.  Hertenstein Decl. (Ex. 8) at ¶ 34; Illingworth
Decl. (Ex. 10) at ¶¶ 9-11 and Ex. A; Walker Decl. (Ex. 11) at ¶¶ 10-13.

F.     **Facts Concerning Plaintiffs' Claims**

12

1.    **Richard Provencher**

39.    Plaintiff Richard Provencher worked at Pfizer from 1963 until his retirement on January 1, 1999.  Complaint at ¶ 3.

40.    Provencher sustained a work-related injury in 1997.  He was placed on long-term disability in 1998, and remained on disability until his retirement.  Provencher dep. (Ex. 1) at 18-19.

41.    Between 1990 and 1997, the Groton Plant underwent substantial change and reorganization, with employees shifting between departments and within departments. Provencher dep. (Ex. 1) at 34-35.

42.    Provencher became aware of Pfizer's downsizing program in 1993, and understood that VSPs were one way to achieve downsizing. Provencher dep. (Ex. 1) at 23-26.

43.    Provencher understood that VSPs were used as incentives to make employees want to retire.  Provencher dep. (Ex. 1) at 34.

44.    Provencher believes Pfizer transferred lab technicians like him to the Quality Control department because Pfizer was "going with the Pharmaceuticals products," and was "getting rid of the food grades and they didn't need the Control Labs [in] the chemicals division."  Provencher dep. (Ex. 1) at 39.

45.    Provencher understands that Pfizer made a business decision when it

decided which departments would be allowed to participate in VSPs.  Provencher dep. (Ex. 1) at 62.

46.     Provencher had no involvement in the creation or implementation of any VSP.  Provencher dep. (Ex. 1) at 69.

47.     Provencher defines a "surplus" employee as a "needed" employee. Provencher dep. (Ex. 1) at 11.

48.     Provencher claims he was "surplus" during the course of his entire career at Pfizer.  Provencher dep. (Ex. 1) at 12.

49.     Provencher was offered the opportunity to participate in a VSP offered in 1993, but declined to do so because he thought more would be offered later. Provencher dep. (Ex. 1) at 27.

50.     Provencher claims he was excluded from the 1995 VSP, and that he would have accepted the 1995 VSP had it been offered to him.  Provencher dep. (Ex. 1) at 27-28, 37-38.

51.     Provencher in fact was offered the opportunity to participate in the 1995 VSP, but declined to do so.  Hightower Decl. (Ex. 9)  at ¶¶ 22-25 and Exs. I, J, K, L; Schachner Decl. (Ex. 12) at ¶ 8.

52.     At no time prior to his injury in 1997 did Provencher lack for work. Provencher dep. (Ex. 1) at 37.

53.     Provencher does not believe that Pfizer failed to offer him a VSP because

14

it wanted to harm him personally. Provencher dep. (Ex. 1) at 62.

54.    Provencher claims he should have been offered the opportunity to participate in the 1995 and 1997 VSPs because a VSP was offered to him in 1993. Provencher dep. (Ex. 1) at 28-29.

55.    From 1997 until his retirement in 1999, Provencher was assigned to the Quality Control Department.  Hightower Decl. (Ex. 9) at ¶ 28.

56.    The Quality Control Department was not one of the departments included in any VSPs offered in 1997, 1998, or 1999.  Hightower Decl. (Ex. 9) at ¶ 28.

57.    At the time of his retirement, Provencher received all benefits to which he was entitled under Pfizer's pension and profit-sharing plans.  He received lump-sum payments of approximately $500,000 (pension) and $80,000 (profit-sharing). Provencher dep. (Ex. 1) at 41.

**2.    Richard Hall**

58.    Plaintiff Richard Hall worked at Pfizer from 1965 until his retirement on April 1, 1999.  Complaint at ¶ 4.

59.    Hall knew that Pfizer was involved in a downsizing program and that it offered VSPs as an incentive for employees to retire.  Hall dep. (Ex. 2) at 31-32, 61-62, 91-92.

60.    Hall also knew that employees were transferred between departments as part of a downsizing program.  Hall dep. (Ex. 2) at 62-64.

61.    Hall had no involvement in VSP adoption or administration. Hall dep. (Ex.

2) at 123-24.

62.     Hall declined the opportunity to participate in a VSP offered in 1991 or 1992.  Hall dep. (Ex. 2) at 80-81.

63.     Hall was not a "surplus" employee at any time between 1995 and 1999. Hall dep. (Ex. 2) at 82, 111.[2]

64.     Hall claims that he was excluded from the 1995 VSP, and that he would have accepted the 1995 VSP had it been offered to him.  Hall dep. (Ex. 2) at 37-38, 41, 70-73, 78.

65.     Hall in fact was offered the opportunity to participate in the 1995 VSP, but he declined to do so.  Hightower Decl. (Ex. 9) at ¶¶ 22-25 and Exs. I-L; Schachner Decl. (Ex. 12) at ¶ 8.

66.     Hall does not believe that Pfizer failed to offer him a VSP because it wanted to harm him personally. Hall dep. (Ex. 2) at 85, 117.

67.     Between 1995 and his retirement, Hall continued to work hard and received wages for his efforts.  Hall dep. (Ex. 2) at 82.

68.     Hall had sufficient work until the time of his retirement; the lab techs worked hard and "always had something to do."  Hall dep. (Ex. 2) at 76-77, 143.

---

[2] After conferring with his attorney, Hall attempted rather unsuccessfully to change his testimony.  He ultimately admitted that he became "surplus" for a brief period of time during a dispute with his supervisor; after that dispute was resolved, he again became "non-surplus."  Hall dep. (Ex. 2) at 140-46.

69.     Hall claims he should have been allowed to participate in the 1995 VSP and the 1999 VSP.  Hall dep. (Ex. 2) at 80.

70.     From 1997 through his retirement in 1999, Hall was assigned to the Quality Control Department.  Hightower Decl. (Ex. 9) at ¶ 28.

71.     The Quality Control Department was not one of the departments included in any VSPs offered in 1997, 1998, or 1999.  Hightower Decl. (Ex. 9) at ¶ 28.

72.     At the time of his retirement, Hall received all benefits to which he was entitled under Pfizer's pension plan.  He received a lump-sum pension payment of approximately $310,000.00.  Hall dep. (Ex. 2) at 69.

**3.     William Garbati**

73.     Plaintiff William Garbati worked at Pfizer from 1963 until his retirement on April 1, 1998.  Complaint at ¶ 5.

74.     After his retirement, and at Pfizer's request, Garbati provided services to Pfizer as a temporary contract worker for another eight months.  Garbati dep. (Ex. 3) at 28-30, 74.

75.     Between 1990 and 1998, many employees in the Groton Plant were transferred between departments.  Pfizer had legitimate business reasons for such transfers as they related to the downsizing program.  Garbati dep. (Ex. 3) at 70-71, 101.

76.     Garbati defines "surplus" to mean too many employees to handle the workload. Garbati dep. (Ex. 3) at 28-30.

17

77.     Garbati was offered the opportunity to participate in a VSP offered in 1993, but he declined to do so.  Garbati dep. (Ex. 3) at 16, 40, 49-50, 63.

78.     Garbati claims he was excluded from the 1995 VSP, and that he would have accepted the 1995 VSP had it been offered to him.  Garbati dep. (Ex. 3) at  16-17, 40, 48, 64.

79.     Garbati in fact was offered the opportunity to participate in the 1995 VSP, but declined to do so.  Hightower Decl. (Ex. 9) at ¶¶ 22-25 and Ex. I, J, K, L; Schachner Decl. (Ex. 12) at ¶ 8.

80.     Garbati claims he became "surplus" in or about 1993 because that year he was offered the opportunity to participate in a VSP.  Garbati dep. (Ex. 3) at 19-20, 45-46.

81.     Although Garbati claims he was surplus beginning in 1993, from that time until his retirement in 1998, he continued to work, receive compensation for his work, and accrue credits toward his pension.  Garbati dep. (Ex. 3) at 23, 47-48.

82.     Garbati believes Pfizer was obligated to allow him to participate in a VSP for the following reason:  "I was a senior person at the Groton plant when I did retire in '98.  So I would have expected a little courtesy my way if they were going to downsize a little bit.  I should have been included in that."  Garbati dep. (Ex. 3) at 26.

83.     Garbati's position is that Pfizer is obligated to offer a VSP to any employee old enough to retire who might require retraining for continued employment.  Garbati dep. (Ex. 3) at 44.

84.     Garbati acknowledges that Pfizer had the right to determine who could participate in VSPs: he testified that "Pfizer could pick who they wanted, but not zero people."  Garbati dep. (Ex. 3) at 42.

85.     Garbati acknowledges that it was Pfizer's decision whether VSPs should be offered to specific departments between 1990 and 2000.  Garbati dep. (Ex. 3) at 53.

86.     Garbati does not believe that Pfizer failed to offer him a VSP because it wanted to harm him personally. Garbati dep. (Ex. 3) at 53.

87.     Garbati believes that because he was offered a VSP in 1993, he should have been offered the opportunity to take any later VSP.  He also believes that because he was not offered a VSP in 1995, he should have been offered a VSP in 1997.  Garbati dep. (Ex. 3) at 42-43.

88.     From 1997 until his retirement in 1998, Garbati was assigned to the Quality Control Department.  Hightower Decl. (Ex. 9) at ¶ 28.

89.     The Quality Control Department was not one of the departments included in any VSPs offered in 1997, 1998, or 1999.  Hightower Decl. (Ex. 9) at ¶ 28.

90.     At the time of his retirement, Garbati received all benefits to which he was entitled under Pfizer's pension and profit-sharing plans.  He received lump-sum payments of approximately $433,000 (pension) and $100,000 (profit-sharing).  Garbati dep. (Ex. 3) at 65-66.

4.    **William Hayden**

91.    Plaintiff Richard Hayden worked at Pfizer from 1964 until his retirement on October 1, 1998.  Complaint at ¶ 6.

92.    The sale of Pfizer's Food Sciences group and the change to pharmaceutical production precipitated the need for downsizing and the offering of VSPs at the Groton Plant. Hayden dep. (Ex. 4) at 165.

93.    Hayden believes that the downsizing program at the Groton Plant began in or about 1995.  Hayden dep. (Ex. 4) at 31.

94.    Hayden understood that the decision to offer a VSP was an economic decision; an employee who could not be transferred became excess and a VSP provided a "graceful" alternative to involuntary layoffs.  Hayden dep. (Ex. 4) at 36-37.

95.    Hayden possessed transferable skills.  Hayden dep. (Ex. 4) at 33, 46.

96.    Hayden understood that VSPs were used to induce employees to retire. Hayden dep. (Ex. 4) at 34, 37-38.

97.    Hayden understood VSPs to be inducements to particular departments and classifications of employees within those departments.  Hayden dep. (Ex. 4) at 62.

98.    Hayden understood that Pfizer reserved the right to limit the number of eligible employees who actually could receive any VSP benefit.  Hayden dep. (Ex. 4) at 63.

99.    Hayden was involved in VSP implementation in a managerial role.  He reviewed employee staffing in his department to forecast whether staff reduction via VSP would work; i.e., which employees might be induced to take early retirement if a VSP were offered.  Hayden attended meetings on such issues in response to business occurrences (e.g., department shutdowns) at the Groton Plant.  Hayden dep. (Ex. 4) at 34, 37-39.

100.    Hayden was offered the opportunity to participate in the 1995 VSP, but declined to do so.  Hayden dep. (Ex. 4) at 52-53 and Ex. 29.

101.    When the 1998 VSP was announced in November of 1997, there were three engineers in Hayden's department.  Hayden's position is that one of those three engineers (Hayden) should have been allowed to participate in that VSP.  Hayden dep. (Ex. 4) at 58-59.

102.    After learning that he would not be eligible to participate in the 1998 VSP, Hayden met with a number of Pfizer representatives (including J. Robert Schachner, Brooks Walker, and Rich Illingworth) to express his displeasure over his omission from the 1998 VSP and to attempt to convince them that he was "surplus" and should be included in the VSP.  Hayden dep. (Ex. 4) at 65-94.

103.    Hayden claims that he met with the Groton Plant manager, J. Robert Schachner, on April 17, 1998.  According to Hayden, he told Schachner at this meeting that he thought he was excess and should be allowed to receive a VSP.  Schachner told Hayden that he would look into the issue for him.  Hayden dep. (Ex. 4) at 64-67.

104.   Hayden claims that he discussed the issue of "future VSPs" with Schachner at this April 17, 1998 meeting.  In the Complaint, Hayden alleges that "he asked Schachner whether Pfizer was considering using any voluntary separation packages to downsize the Groton Plant," and that "Schachner told Hayden that there would be no more such packages used at the Groton Plant."  Hayden, however, does not recall any specifics of that conversation, and specifically does not recall what he asked Schachner about future VSPs, or how Schachner responded to any such questions.  Hayden dep. (Ex. 4) at 67, 168-70; Complaint, Count Two at ¶ 24.

105.   Schachner denies making the specific statement alleged by Hayden, or any similar type of statement.  Schachner Decl. (Ex. 12) at ¶¶ 4-7.

106.   Hayden concluded from his conversation with Schachner that no future VSPs would be offered at the Groton Plant.  Hayden dep. (Ex. 4) at 67, 168-70.

107.   Hayden did not consider any statements by Schachner regarding future VSPs as a guarantee that Pfizer never would offer VSPs at the Groton Plant in the future.  Hayden dep. (Ex. 4) at 68.

108.   Hayden also asked to meet with the Groton Plant's human resources director, Brooks Walker, to discuss his exclusion from the 1998 VSP.  Hayden dep. (Ex. 4) at 70-74.

109.   Hayden met with Walker on May 1, 1998.  According to Hayden, he told Walker at this meeting that he thought he was excess and should be allowed to receive a VSP.  Walker told Hayden that he would look into the issue for him.  Hayden dep. (Ex.

4) at 74; Walker Decl. (Ex.11) at ¶¶ 6-8.

110.    Hayden claims that he discussed the issue of "future VSPs" with Walker at this April 17, 1998 meeting.  In the Complaint, Hayden alleges that "he asked Walker whether Pfizer was considering using any voluntary separation packages to downsize the Groton Plant," and that "Walker told Hayden that there would be no more such packages used at the Groton Plant."  Hayden, however, does not recall any specifics of that conversation, and specifically does not recall what he asked Walker about future VSPs, or how Walker responded to any such questions.  Hayden dep. (Ex. 4) at 78, 169-70; Complaint, Count Two at ¶ 25.

111.    Walker denies making the specific statement alleged by Hayden, or any similar type of statement.  Walker Decl. (Ex. 11) at ¶¶ 4-9.

112.    Hayden concluded from his conversation with Walker that no future VSPs would be offered at the Groton Plant.  Hayden dep. (Ex. 4) at 170.

113.    Hayden did not consider Walker to be an honest person. Hayden dep. (Ex. 4) at 72.

114.    Hayden also asked to meet with Richard Illingworth, Director of Human Resources for Pfizer's U.S. manufacturing operations, to discuss his exclusion from the 1998 VSP.  Hayden dep. (Ex. 4) at 89-92.

115.    Hayden met with Illingworth at his offices in New York City on June 23, 1998.  According to Hayden, he told Illingworth at this meeting that he thought he was excess and should be allowed to receive a VSP.  Illingworth told Hayden that he would

look into the issue for him.  Hayden dep. (Ex. 4) at 91; Illingworth Decl. (Ex. 10) at ¶¶ 6-8.

116.    Hayden claims that he discussed the issue of "future VSPs" with Illingworth at this June 23, 1998 meeting.  In the Complaint, Hayden alleges that "he asked Illingworth whether Pfizer was considering using any voluntary separation packages to downsize the Groton Plant," and that "Illingworth told Hayden that there would be no more such packages used at the Groton Plant."  Hayden, however, does not recall any specifics of that conversation, and specifically does not recall what he asked Illingworth about future VSPs, or how Illingworth responded to any such questions.  Hayden dep. (Ex. 4) at 91-92, 170-71; Complaint, Count Two at ¶ 26.

117.    Illingworth denies making the specific statement alleged by Hayden, or any similar type of statement.  Illingworth Decl. (Ex. 10) at ¶¶ 5-8.

118.    Hayden concluded from his conversation with Illingworth that no future VSPs would be offered at the Groton Plant.  Hayden dep. (Ex. 4) at 170-71.

119.    Hayden had a telephone conversation with Illingworth on or about July 23, 1998, during which Illingworth stated that Pfizer's decision would stand and that it would not offer Hayden a VSP.  Hayden dep. (Ex. 4) at 92-94; Illingworth Decl. (Ex. 10) at ¶ 7.

120.    In his conversations with Schachner, Walker and Illingworth, the Pfizer representatives told Hayden that he was a valuable employee, and Hayden understood that Pfizer wanted him to remain with the Company.  Hayden dep. (Ex. 4) at 121-22.

121.    Hayden kept contemporaneous notes of his conversations with Pfizer personnel regarding his exclusion from the 1998 VSP.  Those notes contain no reference to "future VSPs."  Hayden dep. (Ex. 4) at 106, 122-23 and Ex. 37-C through 37-E.

122.    Hayden defines "surplus" to mean that an employee's job has ceased and there is no further need for his services.  Hayden dep. (Ex. 4) at 132-33.

123.    Hayden became surplus in late 1996 or 1997.  Hayden dep. (Ex. 4) at 133.

124.    Hayden also testified that he became surplus in 1995 because Pfizer offered him a VSP that year.  Hayden dep. (Ex. 4) at 155 and Ex. 29.

125.    From late 1996 through the time of his retirement, Hayden continued to work for Pfizer and to provide valuable services for Pfizer.  Hayden dep. (Ex. 4) at 133-35.

126.    Hayden claims that he began to consider retirement early in 1998 and made his final decision to retire at the end of July 1998, after receiving assurances that no future VSPs would be offered at the Groton Plant.  Hayden dep. (Ex. 4) at 135-37.

127.    As of May 8, 1998, Hayden had made plans to retire on August 4, 1998. Hayden dep. (Ex. 4) at 141; and Exs. 38, 39.

128.    Hayden identified an August 1998 retirement date as far back as 1996. Hayden dep. (Ex. 4) at 141-44; Ex. 40.

129.    At the time he made the decision to retire, Hayden did not believe that Pfizer never would offer a future VSP at the Groton Plan because the "business climate can change, which might precipitate some future VSP or some reduction in force plan, whatever you want to call it."  Hayden dep. (Ex. 4) at 164.

130.    At the time he made his decision to retire, Hayden recognized that Pfizer might offer VSPs at the Groton Plant in the future.  Hayden dep. (Ex. 4) at 176.

131.    At the time he retired, Hayden knew that VSPs in the past had been offered following the shutdown of certain production lines or the sale of product lines. Hayden dep. (Ex. 4) at 38-39; 165-66.

132.    Hayden always planned to retire at the earliest possible opportunity, which was August 4, 1998.  He stopped working at that time, but used accumulated vacation time to delay his effective retirement date to October 1, 1998.  Hayden dep. (Ex. 4) at 95-96, 140.

133.    Between the time he became surplus through the time he retired, Hayden continued to collect a salary, to receive employee benefits, to accrue credits for Pfizer's pension plan, and to accept contributions from Pfizer for his profit-sharing account. Hayden dep. (Ex. 4) at 146.

134.    Pfizer did not transfer Hayden to prevent him from receiving a VSP. Hayden dep. (Ex. 4) at 149, 157-60.

135.    In his initial Complaint dated December 8, 2000, Hayden made no claim regarding any reliance on any "specific" statements made by any Pfizer representatives in making his retirement decision.  Complaint.

136.    In his Amended Complaint dated March 26, 2003, Hayden for the first time alleged that he relied on the "specific" statements of Pfizer representatives, including Kerry Hertenstein, in making his retirement decision.  Amended Complaint, Count Two at ¶ 25.

137.    In his Second Amended Complaint dated September 27, 2004, Hayden changed the "specific" statements by Hertenstein to "specific" statements by Schachner.  Second Amended Complaint, Count Two at ¶ 24.

138.    At the time of his retirement, Hayden knew that Pfizer might offer another VSP to employees at the Groton Plant following his retirement.  Hayden dep. (Ex. 4) at 162, 164, 176.

139.    Hayden believes that the Plant Manager at the time of his retirement (Schachner) knew that another VSP would be offered in the future and should have given him a "wink" to encourage him to delay his retirement for some indeterminate period.  Hayden dep. (Ex. 4) at 164-65.

140.    Hayden speculates that at the time he retired, Pfizer must already have had a "strong contemplation" regarding the 2000 VSP, but he has no specific factual basis for his belief.  Hayden dep. (Ex. 4) at 165.

141.    Hayden believes that, at the time the 2000 VSP was offered, he would have been in the OSP department and thus eligible to participate in that VSP.  Hayden's belief is based on statements allegedly made by his former supervisor, although Hayden acknowledged that "these things can change daily."  Hayden dep. (Ex. 4) at 42, 44-46.

142.    Hayden does not believe that Pfizer failed to offer him a VSP because it wanted to harm him personally. Hayden dep. (Ex. 4) at 148-49.

143.    Hayden claims he should have been allowed to participate in the 1998 VSP.  Hayden dep. (Ex. 4) at 63.

144.    In 1997, Hayden was a staff (overtime exempt) employees assigned to the NMG Department.  Hightower Decl. (Ex. 9) at ¶ 30.

145.    Staff members of the NMG Department were not included in the 1998 VSP.  Hightower Decl. (Ex. 9) at ¶ 30.

146.    At the time of his retirement, Hayden received all benefits to which he was entitled under Pfizer's pension and profit-sharing plans.  He received a lump-sum pension payment of approximately $640,000.  Hayden dep. (Ex. 4) at 142.

**5.    George Gauthier**

147.    Plaintiff George Gauthier worked at Pfizer from 1969 until July 1, 2001. Gauthier dep. (Ex. 5) at 21-22.

148.    Gauthier was offered the opportunity to participate in the 1995 VSP, but declined the offer.  Gauthier dep. (Ex. 5) at 60 and Ex. 9.

149.    Gauthier claims he became "surplus" in or about October of 1999. Gauthier dep. (Ex. 5) at 64-65.

150.    Although Gauthier claims he was "not needed" by Pfizer by the end of 1999, he continued to provide meaningful work for the company, and receive his full salary, until his retirement.  Gauthier dep. (Ex. 5) at 67, 81.

151.    When asked about the possibility of VSPs being offered in the future, Pfizer representatives "would always say we don't know what our needs are going to be and we'll have to wait and see.  They were always very noncommittal. … They wouldn't even commit that there was one coming let alone whether [specific employees] would be in it."  Gauthier dep. (Ex. 5) at 92.

152.    On several occasions prior to October of 1999, Kerry Hertenstein told Gauthier that Pfizer had work for him and his staff; that it would make no business sense for Pfizer to include his department in any future VSP; and that it was unlikely that any future VSP would be offered to his department.  Gauthier dep. (Ex. 5) at 212-15 and Ex. 43; Hertenstein Decl. (Ex. 8) at ¶ 33.

153.    After learning that he would not be eligible to participate in the 2000 VSP, Gauthier met with a number of Pfizer representatives (including Ralph Hightower, Brooks Walker, Kerry Hertenstein, and Rich Illingworth) to express his displeasure over his omission form the 2000 VSP and to attempt to convince them that he was "surplus" and should be included in the VSP.  Gauthier dep. (Ex. 5) at 98-106 and Ex. 5.

154.    Gauthier informed one of the representatives (Illingworth) that he would file a lawsuit if he was not given a VSP.  Gauthier dep. (Ex. 5) at 195-99.

155.    Walker, Hertenstein, and Illingworth advised Gauthier that the company required his services.  Gauthier dep. (Ex. 5) at 121.

156.    On or about December 17, 1999, Gauthier received a memorandum from Hertenstein explaining the reasons for Pfizer's decision not to include his department in the 2000 VSP.  Gauthier dep. (Ex. 5) at 106, 150 and Ex. 6.

157.    Gauthier does not dispute the accuracy of many of the statements made in that memorandum.  Gauthier dep. (Ex. 5) at 153-56.

158.    Gauthier does not believe that Pfizer failed to offer him a VSP because it wanted to harm him personally. Gauthier dep. (Ex. 5) at 119.

159.    Gauthier understands that VSPs are used to encourage employees to retire, but had no involvement in the process for determining VSP eligibility. Gauthier dep. (Ex. 5) at 131, 156.

160.    Gauthier knew that Pfizer reserved the right to limit the number of employees eligible for accepting a VSP.  Gauthier dep. (Ex. 5) at 129-30.

161.     Gauthier acknowledges that he had no legal right to receive a VSP. Gauthier dep. (Ex. 5) at 197.[3]

_____

[3]  After conferring with his attorney, Gauthier attempted to change this testimony, claiming that his response to this question – and this question alone – was affected by medication he had consumed the prior evening.  Gauthier dep. (Ex. 5) at 215-21.

162.   Gauthier had sufficient, meaningful work until the time of his retirement. Gauthier dep. (Ex. 5) at 67.

163.   Gauthier claims he should have been allowed to participate in the 2000 VSP.  Gauthier dep. (Ex. 5) at 61-62.

164.   In October of 1999, Gauthier worked in the Development Lab.  Gauthier dep. (Ex. 5) at 95; Hightower Decl. (Ex. 9) at ¶ 29.

165.   The Development Lab was not one of the departments included in the 2000 VSP.  Gauthier dep. (Ex. 5) at 95; Hightower Decl. (Ex. 9) at ¶ 29.

166.   At the time of his retirement, Gauthier received all benefits to which he was entitled under Pfizer's pension and profit-sharing plans.  He received a lump-sum pension payment totaling $900,000.  Gauthier dep. (Ex. 5) at 137.

**6.   Warren Ruddlesden**

167.   Plaintiff Warren Ruddlesden worked at Pfizer from 1965 until his retirement on March 1, 2000.  Complaint at ¶ 7.

168.   From 1985 through 2000, the Groton Plant underwent a tremendous amount of reorganization and restructuring.  Ruddlesden dep. (Ex. 6) at 24.

169.   Ruddlesden was aware of Pfizer's plan to reduce the size of the workforce.  Ruddlesden dep. (Ex. 6) at 43-44.

170.   Ruddlesden understood VSPs to be a targeted attempt to reduce the size of the workforce.  Ruddlesden dep. (Ex. 6) at 47.

31

171.    Ruddlesden was offered the opportunity to participate in the 1995 VSP, but declined the offer.  Ruddlesden dep. (Ex. 6) at 79-80.

172.    Ruddlesden defines "surplus" to mean that the company has no job for you.  Ruddlesden dep. (Ex. 6) at 81.

173.    Ruddlesden claims he was "surplus" for the final four to five years of his employment.  Ruddlesden dep. (Ex. 6) at 81-82.

174.    For the final four to five years of his employment, Ruddlesden worked only 1.5 hours per day, but never asked for additional work because he thought Pfizer was paying him for what he knew, not what he did.  Ruddlesden dep. (Ex. 6) at 30-35, 56-57.

175.    Ruddlesden "ran" a building that generated a daily profit of $60,000, and Pfizer assigned Ruddlesden an assistant to cover his position if needed.  Ruddlesden dep. (Ex. 6) at 32, 57, 106-07.

176.    During the time he was "surplus," Ruddlesden continued to work, collect pay, accrue pension credit, and accept Pfizer's contributions to his profit-sharing plan. Ruddlesden dep. (Ex. 6) at 83-84.

177.    After learning that he would not be eligible to participate in the 2000 VSP, Ruddlesden met with a number of Pfizer representatives (including Brooks Walker, Kerry Hertenstein, and Rich Illingworth) to express his displeasure over his omission form the 2000 VSP and to attempt to convince them that he was "surplus" and should be included in the VSP.  Ruddlesden dep. (Ex. 6) at 50-51, 58-61, 65, 73.

178.    On or about December 17, 1999, Ruddlesden received a memorandum

from Hertenstein explaining the reasons for Pfizer's decision not to include his department in the 2000 VSP. Ruddlesden dep. (Ex. 6) at 66-67 and Ex. 16; Hertenstein Decl. (Ex. 8) at ¶ 31 and Ex. G; Walker Decl. (Ex. 11) at ¶ 12 and Ex. G.

179.    Ruddlesden does not believe that Pfizer failed to offer him a VSP because it wanted to harm him personally. Ruddlesden dep. (Ex. 6) at 74-75.

180.    Pfizer did not transfer Ruddlesden to prevent him from receiving a VSP. Ruddlesden dep. (Ex. 6) at 116-17.

181.    Ruddlesden claims he should have been allowed to participate in the 2000 VSP. Ruddlesden dep. (Ex. 6) at 48-49.

182.    From 1997 through 1999, Ruddlesden was assigned to the Development Lab. Hightower Decl. (Ex. 9) at ¶ 29.

183.    The Development Lab was not one of the departments included in the any VSP offered in 1997, 1998, or 1999. Ruddlesden dep. (Ex. 6) at 85, 98; Hightower Decl. (Ex. 9) at ¶ 29.

184.    At the time of his retirement, Ruddlesden received all benefits to which he was entitled under Pfizer's pension and profit-sharing plans. He received a lump-sum payment of approximately $900,000. Ruddlesden dep. (Ex. 6) at 78.

**7.    William Zeronsa**

185.    Plaintiff William Zeronsa worked at Pfizer from 1970 until his retirement on March 1, 2002. Zeronsa dep. (Ex. 7) at 24, 32.

186.    Zeronsa was not offered the opportunity to participate in the 1995 VSP,

33

but would have declined the offer in any event.  Zeronsa dep. (Ex. 7) at 58.

187.    Zeronsa claims he became "surplus" in or about 1999 or 2000.  Zeronsa dep. (Ex. 7) at 17-22.

188.    Zeronsa defines a "surplus" employee as one performing responsibilities no longer needed.  Zeronsa dep. (Ex. 7) at 17.

189.    Although Zeronsa claims he was "not needed" by Pfizer by 1999, he continued to provide meaningful work for the company until his retirement and considered himself a valuable employee.  Zeronsa dep. (Ex. 7) at 52-54.

190.    After learning that he would not be eligible to participate in the 2000 VSP, Zeronsa wrote an email to Kerry Hertenstein to express his displeasure and to attempt to convince him that he was "surplus" and should be included in the VSP.  Zeronsa dep. (Ex. 7) at 62-63; Ex. 34.

191.    Zeronsa met with Hertenstein to discuss his disappointment and to seek special consideration for VSP benefits.  Zeronsa dep. (Ex. 7) at 61-67.

192.    On or about December 17, 1999, Zeronsa received a memorandum from Hertenstein explaining the reasons for Pfizer's decision not to include his department in the 2000 VSP.  Zeronsa dep. (Ex. 7) at 79; Ex. 36.

193.    Zeronsa does not dispute the accuracy of most of the statements made in that memorandum.  Zeronsa dep. (Ex. 7) at 79-82.

194.    Zeronsa met with Hertenstein to discuss his disappointment and to seek

special consideration for VSP benefits.  Zeronsa dep. (Ex. 7) at 61-67.

195.    Zeronsa does not believe that Pfizer failed to offer him a VSP because it wanted to harm him personally. Zeronsa dep. (Ex. 7) at 86.

196.    Pfizer did not transfer or reclassify Zeronsa to prevent him from receiving any VSP.  Zeronsa dep. (Ex. 7) at 94.

197.    Zeronsa understood Pfizer's position to be that VSPs "should be offered only to a complete department" while he believed VSPs should be offered to only his "part" of the department.  Zeronsa dep. (Ex. 7) at 63-69, 77.

198.    Zeronsa believes Pfizer discriminated against him by choosing to offer a VSP to only a "part" of his department.  Zeronsa dep. (Ex. 7) at 92-93.

199.    Zeronsa claims he should have been allowed to participate in the 2000 VSP.  Zeronsa dep. (Ex. 7) at 37.

200.    From 1997 through 1999, Zeronsa was assigned to the Quality Control Department.  Hightower Decl. (Ex. 9) at ¶ 31.

201.    The Quality Control Department was not one of the departments included in any VSPs offered in 1997, 1998, or 1999.  Hightower Decl. (Ex. 9) at ¶ 31.

202.    At the time of his retirement, Zeronsa received all benefits to which he was entitled under Pfizer's pension and profit-sharing plans.  He received lump-sum payments of approximately $500,000.00 to $600,000.00 (pension) and $2 million to $3 million (profit-sharing).  Zeronsa dep. (Ex. 7) at 59.

Respectfully submitted,

DEFENDANT
PFIZER INC


By: _____
    Douglas J. Varga (ct18885)

        ZELDES, NEEDLE & COOPER, P.C.
        1000 Lafayette Boulevard
        P.O. Box 1747
        Bridgeport, CT  06601-1747
        Telephone:  (203) 333-9441
        Facsimile:   (203) 333-1489
        Email:  dvarga@znclaw.com

    Its Attorneys

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been sent via United States

Mail, postage prepaid, on this date, to:

> Thomas G. Moukawsher, Esq.
> Moukawsher & Walsh, LLC
> 328 Mitchell Street
> P.O. Box 966
> Groton, CT 06340

Dated at Bridgeport, Connecticut this 30th day of November, 2004.


_____
Douglas J. Varga